UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

MONICA PINTO,

                              Plaintiff,

                  - against -

NEW YORK CITY ADMINISTRATION FOR
CHILDREN'S SERVICES, CITY OF NEW YORK,
JEANETTE VEGA, *individually*, and ZORAIDA DIAZ,
*individually*,

                           Defendants.

-------------------------------------------------------------------------X

Case No.:

**COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Plaintiff, MONICA PINTO, by her attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complains of the Defendants, upon information and belief, as follows:

## NATURE OF THE CASE

1.    Plaintiff complains pursuant to the **Americans with Disabilities Act of 1990**, 42 U.S.C. § 12101, et. seq. ("ADA") and the **New York City Human Rights Law**, New York City Administrative Code § 8-502(a), et. seq. ("NYCHRL")*,* and seeks damages to redress the injuries Plaintiff has suffered as a result of being **discriminated against** by her employer and **denied a reasonable accommodation** for her **disabilities (claustrophobia and anxiety)**.

## JURISDICTION AND VENUE

2.    Jurisdiction of this Court is proper under 42 U.S.C. §12101 et. seq., and 28 U.S.C. §§ 1331 and 1343.

3.    The Court has supplemental jurisdiction over the claims of Plaintiff brought under city law pursuant to 28 U.S.C. §1367.

4.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), as Defendants reside within the Southern District of New York, and the acts complained of occurred therein.

## PROCEDURAL PREREQUISITES

5.    Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunities Commission ("EEOC").

6.    Plaintiff received a Notice of Right to Sue from the EEOC, dated January 26, 2018, with respect to the herein charges of discrimination. A copy of the Notice is annexed hereto.

7.    This Action is being commenced within ninety (90) days of receipt of said Right to Sue.

## PARTIES

8.    That at all times relevant hereto, Plaintiff MONICA PINTO ("PINTO") is a resident of the State of New York and County of Nassau.

9.    That at all times relevant hereto, Defendant THE CITY OF NEW YORK ("CITY") is a municipal corporation, duly existing pursuant to, and by virtue of, the laws of the State of New York, with its principal place of business located at 100 Church Street, New York, New York 10007.

10.    That at all times relevant hereto, the NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES ("ACS") is a department subdivision of Defendant CITY, duly existing pursuant to, and by virtue of, the laws of the State of New York, with its principal place of business located at 150 William Street, 2nd Floor, New York, New York 10038.

11.    That at all times relevant hereto, Defendant CITY operated, maintained, controlled and

supervised ACS.

12.    That at all times relevant hereto, Plaintiff has been a full-time employee of Defendant CITY holding the position of "Child Protective Specialist."

13.    That at all times relevant hereto, Defendant JEANETTE VEGA ("VEGA") was and is an employee of Defendant CITY holding the position of "Child Protective Manager".

14.    That at all times relevant hereto, Defendant VEGA has been Plaintiff's supervisor and/or had supervisory authority over Plaintiff. Defendant VEGA had the authority to hire, fire or affect the terms and conditions of the Plaintiff's employment.

15.    That at all times relevant hereto, Defendant ZORAIDA DIAZ ("DIAZ") is an employee of Defendant CITY holding the position of "Office of Equal Employment Opportunity ('OEEO') Administrative Community Relations Specialist."

16.    That at all times relevant hereto, Defendants, CITY, ACS, VEGA, and DIAZ, are collectively referred to herein as "Defendants."

## MATERIAL FACTS

17.    On or about March 19, 2007, Plaintiff PINTO began working for Defendants as a "Child Protective Specialist," earning approximately $39,000.00 per year.

18.    From the day Plaintiff began her employment with Defendants, Plaintiff has been an exemplary employee, and has never received negative performance review nor write ups.

19.    Through the course of her employment, Plaintiff received a number of raises, and currently earns approximately $52,000.00 per year.

20.    Early in Plaintiff's career, she started to struggle with maintaining her serenity in small spaces, having difficulty traveling in elevators and public transit where she could not control airflow. Her condition deteriorated until she finally sought help from the

Employee Assistance Program ("EAP") to get a referral for her claustrophobia and anxiety.

21.     Initially, Plaintiff was referred to a therapist in Bethpage, New York, a location that made it nearly impossible for Plaintiff to attend the sessions on time after work.

22.     Plaintiff later sought the assistance of the EAP a second time to ask for an accommodation in the form of a transfer to a position with less fieldwork, which typically involved less time in confined spaces. **Plaintiff's request was denied**. As a result, Plaintiff sought another referral for a therapist closer to home. Plaintiff has seen Dr. Bernice Reinharth ("Dr. Reinharth"), since that second referral.

23.     In or around June 2016, Plaintiff informed her manager, Defendant VEGA, that she was struggling in the field due to her disabilities. Defendant VEGA was made aware that Plaintiff was seeking a reasonable accommodation.

24.     On or about July 8th, Plaintiff emailed Defendant DIAZ following up on her call to discuss her request for a reasonable accommodation.

25.     On or about July 18th, Plaintiff emailed the Reasonable Accommodation paperwork to Defendant VEGA, per protocol, and indicated that the paperwork must be forwarded to Defendant DIAZ. Approximately eleven minutes later, Defendant DIAZ complied.

26.     On or about July 22nd, Plaintiff emailed Jodi M. Savage ("Ms. Savage"), the Director of OEEO, regarding her reasonable accommodation request, as Defendant DIAZ's outgoing message indicated she would be absent from the office until July 26th.

27.     On or about July 27th, Plaintiff reached out to Defendant DIAZ once again regarding the status of her reasonable accommodation request. That afternoon, Defendant DIAZ demanded additional information regarding her condition.

4

28.    As a result, Plaintiff signed a number of HIPAA releases to allow Defendants to speak with Dr. Reinharth regarding her condition for the purpose of facilitating her reasonable accommodation request.

29.    On or about August 15th, Plaintiff emailed Defendant DIAZ to learn why she had not followed up with Dr. Reinharth; after Plaintiff submitted the HIPAA authorizations. Defendant DIAZ later instructed Plaintiff to fax the supplemental paperwork from Dr. Reinharth, instead of speaking with the psychologist directly.

30.    On or about August 22th, Plaintiff emailed Defendant DIAZ a supplemental letter from Dr. Reinharth that explained Plaintiff's disabilities in greater detail.

31.    On or about August 29th, Plaintiff met with Defendant DIAZ in person, as required for the interactive process, for approximately fifteen minutes. In that meeting, Plaintiff verbally outlined her medical condition for Defendant DIAZ, and Defendant DIAZ reviewed the letter regarding Plaintiff's disabilities.

32.    On or about August 31st, with no further response from Defendant DIAZ, Plaintiff emailed Serena Scott-Ram ("Ms. Scott-Ram"), Former OEEO Deputy Director, regarding the status of her accommodation request. Ms. Scott-Ram informed Plaintiff that Defendant DIAZ would respond as soon as she received any updates.

33.    Again on or about September 6th, Plaintiff followed up with Defendant DIAZ regarding her request. Defendant DIAZ called Plaintiff within minutes to inform her that Defendants could accommodate her in the Staten Island office. This transfer, however, was did no accommodate Plaintiff's disability. To wit, reporting to the Staten Island location would require Plaintiff to endure a three-hour commute in enclosed public transit, triggering her claustrophobia. The drive to and from that office would further pose

an unreasonable financial burden on Plaintiff. She explained this to Defendant DIAZ, but Defendant DIAZ did not show interest, as she concluded the phone call quickly.

34.     On or about September 7th, Plaintiff emailed Defendant DIAZ to again explain the undue hardship that would be imposed with a transfer to Staten Island, making the suggested transfer unsustainable. Defendant DIAZ soon responded with an acknowledgement, and informed Plaintiff that she had requested another accommodation.

35.     On or about September 12th, another employee of Defendants was assigned a position as a reasonable accommodation in Plaintiff's field office. Defendant DIAZ had previously indicated that the Bedford Avenue Location had no availability. Frustrated with Defendants' lack of communication, Plaintiff emailed Defendant DIAZ to again inquire into the status of her request.

36.     That same day, Defendant DIAZ emailed Plaintiff to inform her that she had not heard any updates to her request.

37.     Approximately one hour later, Defendant DIAZ emailed Plaintiff and instructed her to call her office. Doing so, Plaintiff learned that Defendants offered to accommodate Plaintiff at the Manhattan office. A transfer to that office had the same effect as the transfer to Staten Island, as the additional commuting time would exacerbate Plaintiff's disabilities and place an undue financial burden on Plaintiff. As such, Plaintiff explained that the transfer offered was not sustainable.

38.     **Plaintiff informed Defendant DIAZ that she felt singled out. Several employees had transferred to locations that Plaintiff had requested and been told had no availability**. Since requesting an accommodation, several coworkers have been placed in administrative positions as accommodation in her office in Brooklyn.

6

39.    After being informed by Defendant DIAZ that Ms. Thomas had to approve the request, on
       or about September 19th, Plaintiff emailed Charita Thomas ("Ms. Thomas"), Defendant
       ACS' Associate Commissioner, seeking assistance in her reasonable accommodation
       request

40.    The next day, on or about September 20th, Ms. Thomas responded, copying Nicole
       Rodriguez ("Ms. Rodriguez"), ACS Associate Commissioner, to indicate that Ms.
       Thomas was not the appropriate Associate Commissioner to respond to Plaintiff's
       request. Ms. Thomas assured Plaintiff that Joan Cleary ("Ms. Clearly"), Brooklyn West
       Borough Commissioner, and Ms. Rodriguez would promptly provide Plaintiff with an
       update regarding her request. To date, that has not occurred.

41.    On or about September 22nd, Defendant VEGA started shouting at Plaintiff in Spanish in
       front of other employees, ordering her to come to her office. Defendant VEGA, still
       screaming in Spanish, accused Plaintiff of violating the code of conduct and threatening
       other employees in an email. Knowing that Defendant VEGA's allegations were false,
       Plaintiff requested to see the policy she purportedly violated. Defendant VEGA could not
       provide it. Instead, Defendant VEGA pivoted and accused Plaintiff of bringing her
       "personal problems" into the workplace. Defendant VEGA, in an angry tone, then said
       that she *had* been ready to speak to the Brooklyn Commissioner on Plaintiff's behalf
       regarding her reasonable accommodation request. This seemed to indicate Defendant
       VEGA was no longer willing to speak to the Brooklyn Commissioner about Plaintiff's
       request for an accommodation.

42.    On or about September 26th, Plaintiff emailed Defendant VEGA, copying Vivienne
       Grant ("Ms. Grant"), Deputy Director of Family Services Units, Zone G, and Ms. Cleary,

to memorialize the previous altercation with Defendant VEGA and request a meeting to discuss the event.

43. That same day, **Plaintiff emailed Defendant DIAZ to obtain an update on her accommodation request**.

44. Again, hearing nothing, on or about September 30th, Plaintiff emailed Ms. Scott-Ram and Ms. Savage regarding her accommodation status. **Plaintiff also informed both parties that Defendant DIAZ had not responded promptly, and the request had been initially filed in July 2016**.

45. Later that day, Ms. Scott-Ram emailed back, indicating that she would consider the matter.

46. On or about October 3rd, Plaintiff emailed Ms. Cleary to request a meeting regarding the incident with Defendant VEGA, after not hearing a response from her initial email.

47. Hours later, Plaintiff wrote to Ms. Scott-Ram, Defendant DIAZ and Ms. Savage, regarding Defendant DIAZ's failure to respond to Plaintiff in a timely manner.

48. Defendant DIAZ responded a short time later, indicating that Defendants were still working on an accommodation, and Plaintiff would be notified when something was finalized. In response, Plaintiff, again, explained why the Manhattan office would not allow her to manage her disability, and requested to be placed in field offices in either Brooklyn or Queens.

49. On or about October 4th, Defendant DIAZ informed Plaintiff that Defendants were still searching for an accommodation.

50. On or about October 12th, Plaintiff met with Ms. Cleary, Ms. Grant, Defendant VEGA, and two union delegates, Jill Campbell ("Ms. Campbell") and Yvonne Mosquito ("Ms.

Mosquito"). Ms. Cleary arrived forty minutes late. Prior to Ms. Cleary's arrival, Defendant VEGA started to spin Plaintiff as angry and insubordinate. She refused to address the accommodation issue at hand during the meeting. Instead Defendant VEGA mischaracterized one, out of context, email written by Plaintiff in July 2016; in an attempt to lay blame on Plaintiff. Defendant VEGA continued to antagonize Plaintiff, falsely stating that Plaintiff sought FMLA leave prior to her reasonable accommodation request.

51. Plaintiff attempted to respond just as Ms. Cleary arrived. Missing most of the context, Ms. Cleary started to lecture Plaintiff about respect during meetings; adding insult to the injury of the injustice of Plaintiff's treatment up until that point.

52. Plaintiff attempted to explain that Defendant VEGA painted Plaintiff as an unstable rogue and had told outright lies about her to Ms. Grant. Ms. Cleary continued to minimize Plaintiff's condition, asking Plaintiff if she had a history of being "emotional" while addressing her reasonable accommodation request. Defendants did not address Defendant VEGA's misuse of Plaintiff's private health information to make her look incompetent. Defendants characterized Plaintiff as insubordinate and mentally unstable. Plaintiff's union delegates ended the meeting with a request that Defendants refrain from discussing Plaintiff's personal business in work-related situations.

53. **Throughout the second half of October 2016, Plaintiff submitted multiple requests for updates to Defendant DIAZ, Ms. Scott-Ram, and Ms. Savage. These emails were ignored**.

54. Finally, on or about November 2nd, Defendant DIAZ called Plaintiff to inform her that she could only offer a transfer to the Manhattan building to an office on the 14th floor. This transfer would not only be unreasonable for commuting, but also required Plaintiff

to repeatedly use a small elevator up to the 14th floor every day. As Plaintiff again explained to Defendant DIAZ, that did not accommodation her disabilities. This would exacerbate both her claustrophobia and her anxiety in using the public transportation. Plaintiff inquired as to why she could not be accommodated in Brooklyn or Queens.

55.    On December 28, 2016, Plaintiff's attorneys sent a claim letter and draft complaint to Gladys Carrion, Commissioner of Defendant ACS, outline Plaintiff's claims of discrimination based on her disabilities (claustrophobia and anxiety).

56.    On January 27, 2017, Plaintiff received a call from Defendant DIAZ. She informed Plaintiff that she would be receiving an accommodation to work in the Applications Department, located at 1274 Bedford Avenue, Brooklyn, New York 11216 (the "Bedford Avenue Location"). Plaintiff was instructed to start there on Monday, January 30, 2017.This was an accommodation that would allow Plaintiff to do her the major functions of her job.

57.    After six months with no accommodation, Plaintiff's symptomatology became progressively worse. Since she was forced to continue to be in confined spaces and utilize public transportation. This cause Plaintiff's anxiety to become increasingly generalized; resulting in an increased medication.

58.    Later that day, Plaintiff went to the Applications Department and spoke with Kathy Mays ("Ms. Mays"), the Supervisor, to inform her that she will begin working with them on Monday. Ms. Mays was surprised and informed Plaintiff that no one informed her of this, but she was happy to have the help.

59.    On Monday, January 30th, Plaintiff reported to work at the Applications Department. Ms. Mays informed Plaintiff that she still had not received any notification that Plaintiff was

to begin that morning. Plaintiff stated that she would contact Defendant DIAZ to inquire.

60.     At approximately 10:40 a.m., Plaintiff e-mailed Defendant DIAZ and notified her that no one in Plaintiff's new line of supervision had received notice that she was to start an accommodation that day.

61.     At approximately 10:42 a.m., Defendant DIAZ responded that OEEO was informed, by the Division of Child Protection ("DCP"), of a change to Plaintiff's accommodation. She stated that DCP would notify her office of Plaintiff's accommodation site and they would notify Plaintiff's division about her accommodation. Defendant DIAZ instructed Plaintiff to remain at her current location pending updated information from her.

62.     At approximately 11:52 a.m., Plaintiff followed up to Defendant DIAZ's response, by inquiring into why she was her assignment to the Bedford Avenue Location was suddenly being changed. Plaintiff also inquired into when she would be informed of the reported change, since she had to constantly reach out to Defendant DIAZ seeking information and clarity.

63.     At approximately 11:54 a.m., Defendant DIAZ responded by stating that DCP informed OEEO that they will accommodate Plaintiff at 185 Marcy Avenue, Brooklyn, New York 11211, Zone B (the "Marcy Avenue Location"), and that she would report to Airat Bakare Adejobi ("Ms. Adejobi"). Defendant DIAZ stated that Plaintiff should report to that location that day.

64.     At approximately 1:13 p.m., Plaintiff responded with a detailed e-mail outlining the reasons why she could not accept the accommodation at the Marcy Avenue Location and directly report to Ms. Adejobi. In addition, **Plaintiff informed Defendant DIAZ that she believed that she was being set up for failure by being placed in a situation that**

**might lead to conflicts**.

65. At approximately 2:40 p.m., Defendant DIAZ indicated that she would forward Plaintiff's concerns to Jodi Savage ("Ms. Savage"), Defendant DIAZ's Director.

66. On January 31st, at approximately 4:10 p.m., Plaintiff received a notification from Doris Cochran ("Ms. Cochran"), formerly in the Transfer Unit, that Plaintiff was assigned to begin working at the Marcy Avenue Location, on January 30th. Plaintiff responded to Ms. Cochran's e-mail by inquiring why the transfer went forward, when Plaintiff had already rejected the accommodation. Plaintiff further informed Ms. Cochran that she was awaiting word from the OEEO. Plaintiff received no response.

67. On February 1, 2017, at 4:18 p.m., Plaintiff received a phone call from Ms. Scott-Ram, inquiring into why Plaintiff could not work with Ms. Adejobi. Plaintiff explained her history with Ms. Adejobi. Ms. Adejobi was Plaintiff's prior Deputy Director, prior to her transfer to the Marcy Avenue Location. Plaintiff explained that she was one of the Union Delegates that had many negative interactions with Ms. Adejobi and she played a role in requesting Ms. Adejobi's transfer out of Bedford Avenue Location. **Plaintiff informed Ms. Scott-Ram that she believed that she was being placed into a position that was going to exacerbate her condition and that she was being set up for failure by being placed in a situation that might lead to conflicts**.

68. At 4:45 p.m., Ms. Scott-Ram responded to Plaintiff:

> Good Afternoon Ms. Pinto,
>
> After reviewing your information with the EEO Officer, it has been determined that you must report to 185 Marcy Ave tomorrow at 9:00AM, February 2, 2017. You will be reporting to Ms. Airat Barake-Adejobi, as indicated in the Letter of Introduction dated January 31, 2017 sent to you by Ms. Doris Cochran. This decision

is based on the operational needs of DCP.

Best, Serena Scott-Ram

69.     On February 2nd, Plaintiff was out on a pre-approved day. Audrey Coke ("Ms. Coke"), Child Protective Services ("CPS") Supervisor II and Plaintiff's Supervisor, was aware that she would be out of the office.

70.     After Defendants continued refusal to provide Plaintiff with a reasonable accommodation, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 3, 2017.

71.     On February 3rd, Plaintiff was informed that Ms. Cleary was looking for Plaintiff, as Plaintiff was expected to report to the Marcy Avenue Location on February 2nd.

72.     Plaintiff found it disturbing that Ms. Cleary was taking a personal interesting in her starting another position, when Borough Commissioners do not directly monitor staff on transfers.

73.     On February 3rd, Plaintiff sent Ms. Savage. Plaintiff expressed concern about the new placement and questioned the reasonableness of Ms. Scott-Ram's inquiry into the reasons Plaintiff could not directly report to Ms. Adejobi. Ms. Scott-Ram made her final decision in less than (30) minutes. Plaintiff also stated that Ms. Scott-Ram did not request a list of witnesses or anyone else that could provide confirmation that Plaintiff had an adversarial relationship with Ms. Adejobi, due Plaintiff's direct role in having Ms. Adejobi involuntarily transferred to another location. This involuntary transfer was disciplinary in nature. **Plaintiff continued to emphasize that having to work with Ms. Adejobi would only exacerbate her anxiety/stress condition**.

74.     In addition, **Plaintiff informed Ms. Savage that she believed this conduct was in**

**retaliation for her filing claims against the OEEO, ACS, and the City of New York**. Plaintiff informed Ms. Savage that she intended to appeal the decision, as was her right. **Plaintiff continued that she had been waiting since June of 2016 for a reasonable accommodation**.

75.  This conduct was in stark contrast to treatment of other employees' approved accommodations in Brooklyn, despite Defendant DIAZ informing Plaintiff that she could not be accommodated her in Brooklyn.

76.  Soon thereafter, Plaintiff was called into a meeting with Ms. Grant. Plaintiff reported to that meeting with Everett Wattley ("Ms. Wattley"), a Union Delegate. Ms. Grant inquired into what the challenges were at the Marcy Avenue Location. Plaintiff explained that she already suffered with anxiety and was not able to go to another location that would exacerbate her condition.

77.  Ms. Grant inquired as to why Plaintiff did not speak to Ms. Clearly about her concerns. Plaintiff confided to Ms. Grant that she had sought counsel on this matter and was sure that Ms. Clearly was aware that her name had been mentioned in the draft complaint. Plaintiff stated that she did not expect Ms. Clearly to treat her fairly and therefore did not seek her out.

78.  Despite Plaintiff's explanations, Ms. Grant stated that she had to tell Plaintiff to report to the Marcy Avenue Location. Plaintiff informed Ms. Grant that she was awaiting word from OEEO, as she had rejected that transfer and could not be forced to take it.

79.  She further explained that ACS' Employee Relations had e-mailed her a notice indicating that her work location had changed, despite Plaintiff's objections. Plaintiff also indicated that she wanted to know who instructed Employee Relations to go forward with the

change in work site. Plaintiff ended her conversation with Ms. Grant by stating that she would let her know the outcome.

80.   Upon returning to her desk, Plaintiff received Ms. Savage's response. Plaintiff became overwhelmed with stress and felt physically ill

81.   Plaintiff notified Ms. Savage, by e-mail, that she would be leaving for the day, as she was extremely stressed from the transfer.

82.   Plaintiff also informed Ms. Coke that she was not feeling well and was leaving for the day. Plaintiff cc'd Ms. Grant, Ms. Clearly, Defendant DIAZ, and others at 150 Williams Street, New York, New York 10038 ("150 Williams"). Plaintiff also cc'd Ronald Cook, Jr., her Union Borough Organizer. Ms. Coke acknowledged this information.

83.   Later that day, Plaintiff received a write-up from Ms. Grant indicating that she had been insubordinate in her failure to report to the Marcy Avenue Location. **Plaintiff felt that ACS was strategically violating her rights to get her out of the Bedford Avenue Location**.

84.   **Plaintiff took this conduct as a clear discrimination and retaliation against her, based on her disability (claustrophobia and anxiety)**.

85.   On February 6th, Plaintiff had to go to the emergency room because she was feeling tightness and pain in her chest. Subsequently, Plaintiff had to go out on Family Medical leave because she could not handle the level of anxiety Defendants were putting her through.

86.   On February 9th, Dr. Reinharth informed Plaintiff that she was not making sufficient progress in her therapy. Plaintiff's treatment required her to gradually expose herself to her fear of enclosed spaces. However, Plaintiff's exposure to public transportation daily

was making her condition worse. Dr. Reinharth explained that Plaintiff's condition was starting to generalize and Plaintiff was starting to feel anxiety in places she never felt it before like stores and restaurants.

87.   On March 8th, Plaintiff contacted Farina Shariff ("Ms. Shariff"), ACS' Employee Relations in an attempt to return to work.

88.   On March 9th, Plaintiff submitted medical documentation explaining her condition and limitations for work.

89.   On April 17th, Plaintiff traveled via subway and suffered great anxiety because she was in an enclosed place. She reported to Employee Relations to receive her clearance to return to work. She took the elevator to the 16th floor, and after signing in, was sent to OEEO on the 11th floor, to be interviewed regarding her reasonable accommodation request.

90.   Plaintiff was greeted by Defendant DIAZ and was escorted to a side room for an interview. Defendant DIAZ then excused herself for a short period of time. While Plaintiff was waiting for Defendant DIAZ, a woman entered the room and stated that she was observing the interview because it was her first day of work and she was training. Plaintiff inquired into her role, to which the woman responded that she was an attorney. Plaintiff asked if she worked for the City of New York and she responded that she previously worked for the Family Court Legal Services in Queens.

91.   When Defendant DIAZ returned and sat down, Plaintiff asked directly if it was common practice for an attorney to sit in on a routine EEO interview for a reasonable accommodation. Defendant DIAZ appeared uncomfortable and looked towards the attorney, before stating that the attorney was observing for training purposes.

92.   Defendant DIAZ proceeded with the interview and began asking Plaintiff to describe her condition and limitations in detail. Plaintiff inquired into why it was necessary, as Dr. Reinharth, her treating psychologist, sent highly detailed documentation to the OEEO, on her behalf.

93.   Defendant DIAZ produced the first letter from Plaintiff's psychologist and pointed out that there was not sufficient detail in the letter. Plaintiff was confused as she was aware that her psychologist had sent an updated letter with detail. Defendant DIAZ claimed to have not received any such letter, however, she would go and check her e-mail. Defendant DIAZ went to search for the e-mail. Plaintiff also stepped out for a moment, in order to retrieve the e-mail that she sent to the OEEO.

94.   Upon returning to the interview room, Defendant DIAZ produced the letter that Plaintiff informed her about. Defendant DIAZ quickly filled out a form and informed Plaintiff that she could wait at 150 Williams for an answer regarding her request for an accommodation, or return home. Plaintiff chose to return home, as the commute to Manhattan had placed sufficient stress on her, in addition to having to take the elevator to the OEEO.

95.   Defendant DIAZ stated that Plaintiff would receive a call from her, after she receives an answer from the DCP, regarding Plaintiff's request.

96.   On April 19th, after 2 p.m., Defendant DIAZ called Plaintiff and notified her that DCP could accommodate Plaintiff at the Marcy Avenue Location. Defendant DIAZ stated that Plaintiff should report to 150 Williams to complete her return to work process and then report to her new location. Plaintiff responded that since it was after 2 p.m., she could not

make it to that location in sufficient time and would report to 150 Williams the next morning.

97.  On April 20th, Plaintiff reported to the Employee Relations Office and completed her return to work paperwork, as well as, to receive a letter to provide to her new supervisor. Plaintiff again suffered from anxiety because she had to travel by train.

98.  Upon receiving the letter, Plaintiff proceeded to the Marcy Avenue Location via subway, which caused her anxiety as she was constantly exposed to travel by subway.

99.  Upon arriving at the Marcy Avenue Location, Plaintiff entered the building and went to the fire safety desk, to inquire if the staircase located at the front would lead her to the 2nd floor. The fire safety officer informed Plaintiff that it would not and she would have to use the elevator. Plaintiff informed him that she could not take the elevator and would need to access the 2nd floor via the stairs.

100. The fire safety officer showed Plaintiff a back staircase and requested that the superintendent of the building punch in a code on the door, to allow her access to the 2nd floor. The superintendent stated that he could not provide Plaintiff with the code, until someone told him he could. However, he let her into the stairwell and he departed.

101. Upon climbing the stairs, Plaintiff discovered that the 2nd floor door had a no reentry sign on it and was securely locked. Plaintiff began to feel anxiety in the enclosed space and quickly returned to the fire safety officer to inform him that the door was locked and that she could not gain access. He agreed to take the elevator up and open the door for Plaintiff, from the inside. Plaintiff thanked him and he allowed her access to the stairwell. Plaintiff climbed back to the 2nd floor. However, no one opened the door. Plaintiff began to bang on the door until an ACS officer opened it for her.

102. Plaintiff proceeded to the Applications Office and reported to Cathy Chiou ("Ms. Chiou"), Plaintiff's new supervisor. Plaintiff provided Ms. Chiou with the letter from OEEO regarding her limitations and accommodations in the office. Ms. Chiou reported that she had no notice from anyone that she was getting additional staff. But, Ms. Chiou welcomed Plaintiff and had her sit at a corner desk.

103. From April 20th to May 3rd, Plaintiff did not have access to her ACS e-mail, despite notifying OEEO on her first day.

104. On April 21st, Plaintiff returned to the Marcy Avenue Location. Plaintiff again had difficulty gaining access to the 2nd floor via the stairs. Plaintiff informed Ms. Chiou that she did not believe that the Marcy Avenue Location was an effective placement for her, if she was going to be locked in a stairwell waiting for people to give her access to the 2nd floor.

105. The superintendent attempted to adjust the door, so that it could not lock. This remedy did not work and the door continued to lock. So, the ACS police taped the door lock shut, to allow the door to remain open.

106. The following week, Plaintiff had extreme difficulty traveling from her home to the Marcy Avenue Location, as parking was extremely difficult and the commute was a longer one via car. Plaintiff had no choice but to park her car at another station and take the train to the Marcy Avenue Location, in order to get to work on time. Plaintiff informed Ms. Chiou that traveling on the subway was a hardship for her and she was going to request a change of accommodation.

107. On April 27th, Plaintiff called the OEEO to speak with Defendant DIAZ about requesting a new reasonable accommodation location. Plaintiff explained that the Marcy Avenue

Location was a hardship, as she could not reach the location on time, without taking public transportation. Plaintiff informed Defendant DIAZ that it was an ineffective placement for her and she was requesting a change to any of the other field offices in Brooklyn, besides Adams Street, which would also require a reasonable accommodation. Defendant DIAZ acknowledged the request and reported that she would communicate with DCP and get back to Plaintiff. Defendant DIAZ informed Plaintiff that she would be out of the office on April 28th, therefore she would follow up with Ms. Scott-Ram.

108.   On April 28th, Plaintiff e-mailed Ms. Scott-Ram and inquired if there was any contact with DCP regarding Plaintiff's request for a change of reasonable accommodation. Ms. Scott-Ram responded that she was in receipt of the e-mail, however, she did not have any update for Plaintiff. She instructed Plaintiff to follow up with Defendant DIAZ on May 1st, if she did not get back to Plaintiff with an update, by close of business that day.

109.   On May 1st, Plaintiff followed up with Defendant DIAZ regarding her request for a change of accommodations. Plaintiff informed DIAZ that she had two panic attacks on the subway attempting to get to work. Plaintiff also informed her about the issues with the second-floor door and further informed DIAZ that she was being denied access to Union activities because they took place on a floor inaccessible to Plaintiff without taking an elevator. Plaintiff stressed the seriousness of the situation and informed Diaz that she was still waiting to hear from the OEEO.

110.   On May 2nd, Plaintiff e-mailed Defendant DIAZ again regarding an update on her request, since Plaintiff did not hear back from her.

111.    On May 3rd, when Plaintiff was finally granted access to her e-mails, she saw an e-mail to her attention on May 1, 2017 at 12:56 p.m., which had a letter dated April 27, 2017, attached (the "April 27th Letter").

112.    The April 27th Letter stated that Plaintiff had until May 5th to provide Defendants with updated medical documentation, in order for her to apply for an extension of her reasonable accommodations, or automatically be returned to full duty, as of May 22nd. **At no point, during Plaintiff's contacts with OEEO, via telephone, was she ever informed of such requirements and time frames**.

113.    This letter created a sense of urgency and the lack of adequate notification continued to exacerbate Plaintiff's stress and anxiety, forcing Plaintiff to take off of work on May 4th, to go to her document on an unscheduled visit, in an attempt to get this documentation.

114.    Making matters worse, on May 4th, Plaintiff received the April 27th Letter in the mail, but it was addressed to a Moncia Pinto. It was mailed out and postmarked May 2nd. Plaintiff also received a certified mail delivery notice that a certified letter, address to Moncia Pinto, from Ms. Savage, was mailed on May 2nd at 5:54 p.m. and was at the Post Office. However, it was not available for pick up until May 5th.

115.    On May 5th, Plaintiff e-mailed Defendant DIAZ again and reminded her that she had stated in their last phone conversation that she was going to review Plaintiff's request for a change of reasonable accommodations with Defendant DIAZ's Director.

116.    On May 16th, Plaintiff e-mailed OEEO to inquire if her request for an extension of her reasonable accommodations was approved, as she provided all the requested paperwork from her treating psychologist. **Plaintiff against informed Defendants that her condition was being exacerbated, due to her ineffective placements**.

117.   On June 6th, Plaintiff e-mailed Defendant DIAZ, Ms. Savage, and Ms. Scott-Ram, regarding her unanswered request for a change of accommodations. **Plaintiff notified them that it had been 39 days, since her initial request for a change of accommodations**.

118.   On June 7th, Plaintiff received an e-mail from Ms. Savage stating that Plaintiff's request for an extension of her accommodations was approved. However, Plaintiff would not be accommodated at the Bedford Avenue Location because DCP reported that they could not provide this accommodation. Ms. Savage further stated that Plaintiff would continue to be accommodated at the Marcy Avenue Location.

119.   On June 27th, Plaintiff e-mailed Ms. Savage, Ms. Scott-Ram, and Defendant DIAZ regarding the ineffectiveness of Plaintiff's reasonable accommodations. Plaintiff inquired into why she could not be accommodated at the Bedford Avenue Location or any of the other Brooklyn field offices. **Plaintiff again informed that that she was being left in distress, without appropriate support from her employer**.

120.   Later, Plaintiff received a response e-mail from Ms. Savage, which stated that Plaintiff could not be accommodated at the Bedford Avenue Location because there was no accommodation available there. Ms. Savage also stated that there were no accommodations at the Pine Street or Linden Boulevard offices. However, Ms. Savage made no reference to the Grant Square office, also in Brooklyn, and whether or not Plaintiff could be accommodated there.

121.   On August 2nd, Plaintiff reached out to the OEEO again regarding her request for a change of accommodations. **Plaintiff indicated that she had no reports from OEEO, since June 27th**.

122.   On August 8th, Plaintiff e-mailed Defendant DIAZ stating that her psychologist was going to be faxing a letter on her behalf to the OEEO. Plaintiff explained that the letter would be in regard to her condition and a request for an extension of her accommodations. Plaintiff requested updated documentation from OEEO regarding her request for an extension.

123.   Later that day, Defendant DIAZ responded to Plaintiff's e-mail, reporting that she received nothing on Plaintiff's behalf. Plaintiff contact Dr. Reinharth, who assured Plaintiff that she sent the required documents to OEEO. However, Dr. Reinharth stated that she would resend the information to the OEEO.

124.   During the week of August 14th, there were severe rainstorms causing the Marcy Avenue Location's superintendent to close the side entrance that allowed Plaintiff access to the 2nd floor. He stated that Plaintiff would have to take the elevator.

125.   Plaintiff responded that she could not take the elevator. In response, the superintendent laughed and told Plaintiff to just close her eyes and take it up to the 2nd floor. He went on to say that he could not believe that Plaintiff served in the Army for fourteen (14) years and was afraid of elevators.

126.   Plaintiff was incensed and felt ashamed, as he made these remarks in front of the fire safety director. Plaintiff also felt that her condition was being minimalized and mocked.

127.   Plaintiff proceeded to look for Ms. Chiou's desk number, to call her and report that she was downstairs, ready to work, however, the door was locked and she could not gain access to the 2nd floor.

128. At that point, the fire safety officer instructed the superintendent to unlock the side door and give Plaintiff access to the stairwell. Both men appeared annoyed that they had to take this act to accommodate Plaintiff.

129. On August 21st, Plaintiff received an e-mail from Ms. Savage, which stated that Plaintiff's accommodation was extended for one month at the Marcy Avenue Location. She further stated that Plaintiff's accommodations would end on September 22, 2017.

130. Subsequently, Plaintiff's psychologist sent another letter to request a three-month extension on Plaintiff's accommodation.

131. Plaintiff has missed most Mondays at work because she cannot travel alone, without her partner, who was a support to her on the train. On Mondays, he is unable to accompany Plaintiff, and as a result, plaintiff suffers severe panic attacks, attempting to take a crowded train without him.

132. Making matters worse, on or about August 21st, Plaintiff became aware that her work e-mail archives disappeared. Plaintiff immediately put in a work order ticket.

133. On or about August 23, 2017, a technician worked with Plaintiff to remedy her missing archives. Plaintiff's computer stopped working and the technician had to reimage Plaintiff's computer, in order for her to access her e-mail archives.

134. On or about September 11, 2017, Plaintiff e-mailed Defendant DIAZ, Ms. Savage, and Ms. Scott-Ram, requesting an update regarding her request for a change of reasonable accommodation, as it was ineffective. Plaintiff also stated that the OEEO was not participating in the interactive process. In addition, Plaintiff provided an updated medical note from Dr. Reinharth, which included an extension to Plaintiff's reasonable

accommodation. Moreover, Plaintiff informed them that she was willing to move to any of the Brooklyn field offices.

135.    Plaintiff never received a response to this e-mail.

136.    On or about September 13, 2017, Plaintiff learned through an inquiry by Ms. Chiou to Peter Goldman ("Mr. Goldman"), an Administrative Manager in Brooklyn, that there were at least four (4) reasonable accommodation positions in Brooklyn, including two (2) positions at the Grant Square Field Office and two (2) positions at the Linden Boulevard Field Office.

137.    Plaintiff inquired if all four (4) positions were within the coverage area of Shirley Sealey ("Ms. Sealey"), Deputy Director of Administrator. Ms. Chiou responded in the affirmative. Plaintiff responded that she believed that Ms. Sealey would prevent Plaintiff from getting a reasonable accommodation in Ms. Sealey's coverage area due to Plaintiff's prior Union Delegate activity against Ms. Sealey. In addition, due those Union Delegate activities, Plaintiff felt that if it was up to Ms. Sealey, Plaintiff would not receive a change of accommodation.

138.    On or about October 12, 2017, Plaintiff e-mailed Defendant DIAZ, Ms. Savage, and Ms. Scott-Ram, informing them that her accommodation was ineffective and that she was willing to move to any of the Brooklyn field offices. However, Plaintiff never received a response.

139.    On or about November 13, 2017, Plaintiff learned from Blessing Alechenu ("Ms. Alechenu"), Child Protective Specialist, after Ms. Alechenu sent an inadvertent office-wide e-mail, that Ms. Alechenu was provided a reasonable accommodation at the Bedford Avenue Location, since on or about November 3, 2017. However, Defendants have

repeated told Plaintiff that there were no reasonable accommodations at the Bedford Avenue Location.

140.    On or about January 18, 2018, Plaintiff received a write-up from Moses Sutherland ("Mr. Sutherland"), Child Protective Manager; and Ms. Chiou, with Ronald Bridges ("Mr. Bridges"), Deputy Director, copied on the write-up. This write-up alleges that Plaintiff had issues with her time and leave. Plaintiff reminded Ms. Chiou that she struggled with commuting on Mondays, without her support, since her fiancé worked from home on Mondays. Plaintiff also explained when she attempted to commute alone, these attempts ended in panic attacks and heightened anxiety. (the "January 18, 2018 Write-Up").

141.    In addition, Plaintiff was forced into a late afternoon meeting with Mr. Sutherland and Ms. Chiou, under the guise that Mr. Sutherland wanted to meet with the Applications Department. Moreover, Plaintiff was not afforded the time needed to get a Union representative, for this meeting. During the meeting, Plaintiff explained to Mr. Sutherland that working at the Marcy Avenue Location was a hardship for her because it exacerbated her condition. Plaintiff also explained that the EEO was fully aware of this and both Plaintiff and Plaintiff's doctor, informed them that an accommodation at the Marcy Avenue Location was ineffective.

142.    Plaintiff then informed Mr. Sutherland that she would not be able to come into work on Mondays because it exacerbated her condition. In addition, Plaintiff explained that there was a new individual on her case, named Jessica Cooke ("Ms. Cooke"), and that Ms. Cooke was exploring sending Plaintiff to Queens, as a reasonable accommodation.

143.    Mr. Sutherland stated that leave without pay request from Plaintiff would be rejected by Ms. Chiou, going forward. However, there is no time and leave policy that states that

supervisors can reject those requests. In fact, if staff do not have time, they can still take the day off and request that it be done without pay.

144.   As of the date of this complaint, Plaintiff has not heard back from OEEO, regarding this request. Plaintiff has been requesting a reasonable accommodation since July 2016 and has yet to be placed in an appropriate reasonable accommodation.

145.   Plaintiff struggles on a daily basis with taking the train to work and has arrived to work in tears from her panic attacks.

146.   The OEEO continues to willfully ignore Plaintiff's situation and refuses to provide Plaintiff with alternative placements. Defendants only provide Plaintiff with communications when she reaches out to them.

147.   Plaintiff's psychologist has indicated that Plaintiff has a severe case of anxiety because Plaintiff's claustrophobia. However, the OEEO continues to ignore this information.

148.   While Plaintiff's request could have easily been accommodated, Defendants have completely refused to offer reasonable accommodation to Plaintiff's disabilities.

149.   Defendants have arbitrarily refused to grant Plaintiff a reasonable accommodation, even though it would pose **no undue burden** to them.

150.   Upon information and belief, multiple employees have been provided reasonable accommodations at the Bedford Avenue Location, including but not limited to: (1) Monifa Scafe, ACS Child Protective Specialist; (2) Sharon Belsario, ACS Child Protective Specialist; (3) Shemroy Haynes, ACS Child Protective Specialist; as well as, multiple other employees.

151.   On or about January 26, 2018, Plaintiff received her Notice of Right to Sue ("NRTS") from the EEOC.

152.  As of the date of this complaint, Plaintiff has not received a response to her rebuttal to the January 18, 2018 Write-Up.

153.  In addition, despite Plaintiff submitting her timesheets promptly on or about January 30, 2018, Defendants have yet to approve her hours, which would prevent Plaintiff from being properly paid for her time.

154.  Defendants did not engage, and have not engaged, Plaintiff in any meaningful discussion regarding possible alternative reasonable accommodations for Plaintiff or offer any reasonable alternatives to her present working arrangement that would enable Plaintiff to continue her employment.

155.  Rather than engaging in a meaningful interactive process, Defendants offered only wholly unreasonable transfers that would have put an undue burden on Plaintiff, and did not actually accommodate her disabilities.

156.  As a result of Defendants' actions, Plaintiff's claustrophobia and anxiety has been exacerbated. She is continually forced to use elevators, be enclosed in tight spaces, and use public transportation. This cause her anxiety to become more and more generalized as she is re-triggered several times a day.

157.  Plaintiff's disabilities are impairments that substantially limit one or more of her major life activities within the meaning of §12102(1)(A) of the ADA, including but not limited to, performing manual tasks, walking, and lifting.

158.  Plaintiff is a qualified individual who can perform the essential functions of her employment with a reasonable accommodation as defined by §12111(8) of the ADA.

159.  Plaintiff has been offended, disturbed, confused, and humiliated by Defendants' blatantly unlawful, discriminatory, and retaliatory actions.

160.   Plaintiff's performance has been, upon information and belief, above average during the course of her employment with Defendants.

161.   Plaintiff has been unlawfully discriminated against, humiliated, and degraded, and as a result, suffers loss of rights, and emotional distress.

162.   Defendants' actions and conduct were and are intentional and intended to harm Plaintiff.

163.   As a result of Defendants' actions, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

164.   As a result of Defendants' discriminatory treatment of Plaintiff, she has suffered severe emotional distress and physical ailments.

165.   As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

166.   As a result of the above, Plaintiff has been damaged in an amount in excess of the jurisdiction of the Court.

167.   Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff demands Punitive Damages as against all Defendants, jointly and severally.

### AS A FIRST CAUSE OF ACTION FOR DISCRIMINATION
### UNDER THE AMERICANS WITH DISABILITIES ACT
#### (Not as Against the Individual Defendant)

168.   Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

169.   Plaintiff claims Defendants, CITY and ACS, violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (ADA), as amended, as these titles appear in volume 42 of the

United States Code, beginning at section 12101.

170. Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112, Discrimination [Section 102] states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

171. Defendants, CITY and ACS, engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of her disabilities and refusing to provide Plaintiff with a reasonable accommodation.

172. As such, Plaintiff has been damaged as set forth herein.

### AS A SECOND CAUSE OF ACTION FOR DISCRIMINATION
### UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

173. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

174. The New York City Administrative Code §8-107(1) provides that

> It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

175. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(1)(a) by discriminating against Plaintiff solely because of her disabilities and refusing to provide Plaintiff with a reasonable accommodation.

### AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION
### UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

176.   Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

177.   The New York City Administrative Code §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person **to aid, abet, incite, compel, or coerce** the doing of any of the acts forbidden under this chapter, or attempt to do so."

178.   Defendants, VEGA and DIAZ, engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, retaliatory, and unlawful conduct.

### JURY DEMAND

179.   Plaintiff requests a jury trial on all issues to be tried.

     **WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.   Declaring that Defendants engaged in unlawful employment practices prohibited by the **Americans with Disabilities Act** and the **New York City Human Rights Law**, in that Defendants discriminated against Plaintiff on the basis of her disability by failing to provide Plaintiff with a reasonable accommodation for her disabilities.

B.   Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and retaliation and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.   Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D.   Awarding Plaintiff punitive damages;

E.     Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action; and

F.     Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.


Dated:  New York, New York
        March 1, 2018


                                            PHILLIPS & ASSOCIATES,
                                            ATTORNEYS AT LAW, PLLC


                            By:     _____
                                            Marjorie Mesidor, Esq.
                                            Brittany A. Stevens, Esq.
                                            *Attorneys for Plaintiff*
                                            45 Broadway, Suite 620
                                            New York, New York 10006
                                            T: (212) 248-7431
                                            F: (212) 901 - 2107
                                            mmesidor@tpglaws.com
                                            bstevens@tpglaws.com

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:  **Monica Pinto**
**77 Twig Lane**
**Levittown, NY 11756**

From:  **New York District Office**
**33 Whitehall Street**
**5th Floor**
**New York, NY 10004**

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2017-01298** | **Ashraf Ahmed,**<br>**Investigator** | **(212) 336-3781** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☒  Other (briefly state)    **Parallel Lawsuit Through NYS Supreme Court**

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Kevin J. Berry,
District Director

1/26/2018
(Date Mailed)

Enclosures(s)

cc:  **Susan Starker, Esq.**
**Director - Employment Law Unit**
**NEW YORK CITY ADMINISTRATION FOR**
**CHILDREN'S SERVICES**
**110 Williams Street  20th Floor**
**New York, NY 10038**

**Marjorie Mesidor, Esq.**
**PHILLIPS & ASSOCIATES**
**45 Broadway, Suite 620**
**New York, NY 10006**

Enclosure with EEOC
Form 161 (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Courts often require that a copy of your charge must be attached to the complaint you file in court.  If so, you should remove your birth date from the charge.  Some courts will not accept your complaint where the charge includes a date of birth.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit **before 7/1/10** – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):** The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➤ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.

➤ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions,** such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

➤ **Only one** major life activity need be substantially limited.

➤ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

➤ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active.**

➤ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**

➤ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

➤ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

➤ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.

➤ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.